UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN KING,

        Plaintiff,                                   Hon. Wendell A. Miles

v.                                                 Case No. 4:02 CV 141

CHUCK ZAMIARA, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' Motion to Dismiss. (Dkt. #49). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **denied**.

## BACKGROUND

Plaintiff claims that he is "well known by all Defendants" as a result of his involvement in *Cain v. Michigan Department of Corrections*, a "pending class action litigation against the Michigan Department of Corrections." (Plaintiff's Amended Complaint at ¶ 13).

According to Plaintiff, he transferred to Brooks Correctional Facility (LRF) on September 17, 1999, at which point he was informed that "we are fully aware of who you are, we have been expecting you and have something you'll never forget." *Id.* at ¶ 14. Plaintiff asserts that upon his arrival he was housed with an inmate who "appeared to be mentally disturbed." *Id.* at ¶ 15. A subsequent request by Plaintiff to be moved to a different cell was allegedly rejected. *Id.* at ¶ 16.

Plaintiff claims that shortly after his arrival at Brooks, Defendant Wells informed another inmate that Plaintiff "was a 'troublemaker' because of his involvement with Prison Legal Services of Michigan." *Id.* at ¶ 17. On September 24, 1999, an MDOC official completed a Notice of Intent to Classify to Segregation form, indicating that

> It is believed that Prisoner King is attempting to incite a demonstration amongst the prisoners. It is for the safety and security of the institution that King be placed in segregation pending investigation.

*Id.* at Exhibit A.

Plaintiff asserts that this Notice was completed at the direction of Defendant Wells. *Id.* at ¶ 19. Plaintiff was placed in segregation for a period of five days. *Id.* at ¶¶ 19-20.

According to Plaintiff, he later became "Chairman of the Warden's Forum." *Id.* at ¶ 23. As articulated by MDOC policy, the role of prisoner representatives on the Warden's Forum "is to assist with the identification and resolution of prisoner concerns." *Id.* at Exhibit C. Plaintiff asserts that as a member of the Warden's Forum, he "filed complaints against defendants Lewis & Wells and other staff via departmental regulations." *Id.* at ¶ 23.

On February 19, 2000, Plaintiff was charged with a major misconduct violation for allegedly being "out of place." *Id.* at Exhibit D. Plaintiff asserts that he was charged with this violation at the behest of Defendant Wells. *Id.* at ¶ 24. Plaintiff was found not guilty of this charge. *Id.* at Exhibit D. On March 31, 2000, Defendant Lewis, again at the alleged behest of Defendant Wells, charged Plaintiff with a major misconduct for allegedly "creating a disturbance." *Id.* at Exhibit E. Plaintiff was found not guilty of this charge as well. *Id.* Plaintiff asserts that these particular charges were asserted against him in retaliation for his "own written complaints and assistance to other prisoners via the Warden's Forum and Departmental Grievance Procedure." *Id.* at ¶ 26.

> On April 20, 2000, Defendant Wells authored the following memorandum:
>
> I am requesting that [Plaintiff] be removed from Conklin Unit. He is becoming increasingly more powerful in the eyes of prisoners in Conklin Unit. He has made the statement to a unit officer that "these guys in the unit will do what ever I ask" [and] "if I wanted to cause a disturbance I could anytime." Prisoners have also approached me on several occasions with different types of request[s] and when refused they will either state that "they will get with someone who will take [care] of it" and when the grievance is written it is more often than not written by prisoner King or they will state that they will make sure "King knows about this." The most recent situation, in where King was found not guilty on a Creating a Disturbance, has boosted King's status in the unit with the prisoners. I believe it should be considered a security risk to the unit officers when [Plaintiff's] authority over other prisoners is higher then the officers working in the unit. I have attached other examples of his behavior to this report. I am asking for permission to move him on the next move day, 4-26-00.

*Id.* at Exhibit F.

> On May 8, 2000, Defendant Chaffee sent the following email to Defendant Zamiara:
>
> Deputy Harry has asked for [Plaintiff] to be transferred to an alternate Level II. We are asking for DRF placement. The reason for [this] request is that he has been at LRF for 6 months[,] during this time he has developed a cadre of followers over whom he has substantial influence. It seems that he can instigate them to create problems (grievances, complaints to the Warden's Forum, etc.) while he remains uninvolved directly. Currently he is printing out grievances about various issues and having other prisoners sign them and send them in. Deputy Harry has asked for a "break" from prisoner King and would accept him back after a period of time.

*Id.* at Exhibit H.

Defendant Zamiara responded, "[L]et's send him to URF as a level III, note in the departure, prisoner is perceived as a disruptive prisoner who is manipulating others to create unrest at LRF." *Id.* Plaintiff was transferred on May 17, 2000. *Id.* at Exhibit I. Plaintiff asserts that his security level was increased for retaliatory purposes. *Id.* at ¶¶ 32-34, 68-74. Plaintiff further asserts that the

documents pertaining to his transfer were incorrectly completed prior to his transfer and were subsequently altered and revised for retaliatory purposes. *Id.* at ¶¶ 36-39, 75-82.

On April 1, 2003, Defendants filed a motion for summary judgment. (Dkt. #19). On January 23, 2004, the undersigned recommended that Defendants' motion be granted. (Dkt. #28). On March 5, 2004, the Honorable Wendell A. Miles adopted the Report and Recommendation and dismissed Plaintiff's action. (Dkt. #30). Plaintiff appealed this determination to the Sixth Circuit Court of Appeals which subsequently granted in part his appeal. *King v. Zamiara*, 150 Fed. Appx. 485 (6th Cir., Oct. 7, 2005). The court affirmed the dismissal of Plaintiff's action save for his claim that his security level was increased in retaliation for engaging in constitutionally protected conduct. *Id.* at 491-96. With respect to this particular claim, the court found that there exist genuine issues of material fact precluding summary judgment. *Id.* Accordingly, the court remanded the matter to determine whether Defendants are entitled to qualified immunity. *Id.* at 490. Specifically, the court of appeals instructed this Court to determine whether "increasing an inmate's security level for engaging in protected conduct was a 'clearly established' constitutional violation in May 2000." *Id.* at 491 n.3. Defendants now move for dismissal of Plaintiff's complaint on the ground that they are entitled to qualified immunity.

## **QUALIFIED IMMUNITY STANDARD**

The doctrine of qualified immunity recognizes that government officials must be able to carry out their duties without fear of harassing litigation. *See Davis v. Scherer*, 468 U.S. 183, 195 (1984). As is well recognized, they can do so only if they reasonably can anticipate when their conduct may give rise to liability for damages, and if unjustified lawsuits are quickly terminated. *Id.*

Generally, when government officials perform discretionary functions, they are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Determining whether a defendant is entitled to qualified requires application of a two-step analysis. The Court must first determine whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that a constitutional violation has occurred. *See Siggers-El v. Barlow*, 412 F.3d 693, 696 (6th Cir. 2005). If the plaintiff clears this hurdle, the Court must determine whether "the violation involved a clearly established right of which a reasonable person would have known." *Id.*

As previously noted, the Sixth Circuit found that Plaintiff presented evidence sufficient to establish a violation of his constitutional rights. Specifically, Plaintiff has presented evidence which, if believed, demonstrates that Defendants increased his security level in retaliation for engaging in constitutionally protected conduct. Thus, the only remaining question is whether Plaintiff's right to not have his security level increased in retaliation for exercising his constitutional rights was clearly established as of May 2000.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bell v. Johnson*, 308 F.3d 594, 601-02 (6th Cir. 2002). A defendant is not entitled to qualified immunity simply because the "the very action in question" has not previously been held unlawful. *Id.* at 602. As the Supreme Court has stated, "officials can still be on notice that their conduct violates established law even in novel

factual circumstances." *Hope*, 536 U.S. at 741. In such circumstances, the question is whether the unlawfulness of the defendant's actions is "apparent" in light of then existing law. *Bell*, 308 F.3d at 602.

## ANALYSIS

On March 8, 1999, the Sixth Circuit issued an *en banc* decision in *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999). In this case, the court clarified the standard applicable to retaliation claims. Specifically, the court held that claims that a prisoner had been improperly retaliated against for exercising his First Amendment rights would be evaluated pursuant to the following three-factor analysis: (1) was the prisoner engaged in constitutionally protected conduct; (2) was an adverse action taken against the prisoner that would deter a person of ordinary firmness from continuing to engage in such protected conduct; and (3) does there exist a causal connection between the prisoner's protected conduct and the adverse action taken against him, in other words was the adverse action motivated (even in part) by the prisoner's protected conduct. *Id.* at 386-94.

The issue raised by Defendants' motion to dismiss is not whether it was clearly established in May 2000 that retaliation in general was unconstitutional. As the *Thaddeus-X* court recognized, according to then present law it was "well settled" that "retaliation under color of law for the exercise of First Amendment rights is unconstitutional." *Id.* at 386 (quoting *Zilch v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994).

Rather, the issue raised by Defendants' motion to dismiss is whether it was clearly established in May 2000 that increasing a prisoner's security level in retaliation for engaging in constitutionally protected activity constituted impermissible retaliation. In other words, to employ the analysis articulated by the *Thaddeus-X* court, the issue is whether it was clearly established in May 2000

that increasing a prisoner's security level constituted an adverse action capable of deterring a person of ordinary firmness from continuing to engage in such protected conduct. While the Court has not located authority directly addressing this issue in the context of the present fact situation, the Court nonetheless concludes that as of May 2000 the law was sufficiently clear that a reasonable prison official would have understood that increasing a prisoner's security level would constitute an adverse action capable of deterring a person of ordinary firmness from continuing to engage in protected conduct.

In its discussion regarding the "adverse action" element, the *Thaddeus-X* court observed that "since there is no justification for harassing people for exercising their constitutional rights [the effect on freedom of speech] need not be great in order to be actionable." *Thaddeus-X*, 175 F.3d at 397 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). The court further observed that the adverse action requirement was designed to eliminate only those retaliation claims involving "de minimis" or "inconsequential" threats or deprivations. *Thaddeus-X*, 175 F.3d at 398. In other words, any action imposing more than a de minimis or inconsequential impact satisfied the adverse action requirement.

As is well recognized, a prisoner whose security level is increased experiences greater restrictions and fewer privileges. *See King*, 150 Fed. Appx. at 494. For example, as of May 2000, an increase in a prisoner's security level could have resulted in restrictions in the amount and type of personal property he could possess. *See* Mich. Dep't. of Corr. Policy Directive 04.07.112. An increase in security level may have eliminated the prisoner's ability to participate in prison programs and organizations. *See* Mich. Dep't. of Corr. Policy Directive 05.03.100. A prisoner whose security level was increased may have suffered restrictions in his ability to participate in leisure time activities. *See* Mich. Dep't. of Corr. Policy Directive 05.03.104. Finally, an increase in security level may have negatively impacted a prisoner's ability to participate in work programs or special alternative

incarceration programs. *See* Mich. Dep't. of Corr. Policy Directives 05.01.100; 05.02.130; and 06.04.106.

In light of the negative ramifications which may have accompanied an increase in security level, the Court concludes that any reasonable prison official would have understood, as of May 2000, that increasing a prisoner's security level was neither a de minimis imposition nor constituted an inconsequential action. Thus, a reasonable prison official would have understood that increasing a prisoner's security level would deter a person of ordinary firmness from engaging in constitutionally protected activity. Accordingly, Defendants are not entitled to qualified immunity as the right in question was clearly established as of May 2000.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that Defendants' Motion to Dismiss, (dkt. #49), be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: June 29, 2006  /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge