UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN KING, #171671,

    Plaintiff,

v.                                         CASE NO. 4:02-CV-141

CHUCK ZAMIARA, CURTIS CHAFFEE,    HON. ROBERT HOLMES BELL
SHARON WELLS, MICHAEL
SINGLETON, AND MARY BERGHUIS,

    Defendants.
_____/

## OPINION OF THE COURT

This is a 42 U.S.C. § 1983 civil rights action filed by Kevin King, a prisoner in the custody of the Michigan Department of Corrections ("MDOC"). King filed this action in December 2002 alleging that he was transferred to a higher security prison facility in May 2000 in retaliation for his exercise of his First Amendment rights.[1] A bench trial was conducted on June 29-30, 2009. At trial King was represented by *pro bono* counsel, and the MDOC was represented by an Assistant Attorney General for the State of Michigan. The

---

[1] Although King's original complaint included additional defendants and claims, pretrial rulings by this Court and the Court of Appeals narrowed the issue for trial to the single claim of retaliation against Defendants Chuck Zamiara, Curtis Chaffee, Sharon Wells, Michael Singleton, and Mary Berghuis. *See King v. Zamiara* (*"King I"*), 150 F. App'x 485, 491 (6th Cir. 2005); *King v. Zamiara*, No. 06-2271 (6th Cir. Apr. 26, 2007) (*"King II"*).

parties presented testimony from Kevin King, Shirlee Harry, Curtis Chaffee, Chuck Zamiara, Sharon Wells, Sandra Galiton, Bonnie Lewis, Michael Singleton, Mary Berghuis, Dan Bolden, Norma Killough, and Laura Heinritz, and the depositions of Ed Mize, Rick Smith, Nick Ludwick, and Peter Govorchin for consideration as trial testimony.

The Court makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, based upon its review of the witnesses' testimony, the deposition testimony, the documentary evidence, and the parties' post-trial submissions.

## I.

This case arises against the backdrop of *Cain v. Michigan*, a class action lawsuit initiated by a group of prisoners in 1988 against the Department of Corrections. The *Cain* litigation was primarily concerned with prisoner personal property issues, but it also raised issues relating to prisoner classification and access to the courts. (Govorchin Dep. 5.) The *Cain* case spawned many interim orders during the fifteen years that it was pending. King was not a named plaintiff in the *Cain* proceedings, but he was well informed about the case and actively assisted the *Cain* attorneys by posting the interim notices issued in the *Cain* case and by monitoring and reporting on the conditions at his current residential facility.

## II.

King has been in the custody of the MDOC since 1983, when he was convicted of First Degree Murder and sentenced to life in prison. At the time the events giving rise to this

case took place, King had been in custody of the MDOC for over 16 years. He had spent the first eight years of his confinement at higher security Level IV and Level V prisons, and the next eight years at lower security Level II and Level III prisons.

On September 17, 1999, King was transferred from Saginaw Correctional Facility (SRF) ("Saginaw"), a Level II facility, to Brooks Correctional Facility (LRF) ("Brooks"), another Level II facility. The reason given for the transfer was Saginaw's suspicion that King was "a vocal participant to organize a protest over Prisoner Personal Property issues." (Ex. 47.)

On September 24, 1999, Acting Resident Unit Supervisor ("ARUS") Sandra Galiton (f/k/a Naves) issued King a Notice of Intent to Classify to Administrative Segregation ("NOI") because, "based on information received, it is believed that prisoner King is attempting to incite a demonstration amongst the prisoners." (Ex. 11.) King was placed in administrative segregation pending a hearing scheduled for September 29, 1999. (*Id.*)

On September 27, 1999, before a hearing could be held on the NOI, King was transferred to Southern Michigan Correctional Facility (SMN-II) for hernia surgery. His transfer order noted that he had been transferred from Saginaw due to his attempts to organize a demonstration, and that "[s]ince his arrival at LRF he has attempted to do the same." (Ex. 48.) King was returned to general population at Brooks on November 9, 1999. (Ex. 49.) It does not appear from the record that the MDOC ever held a hearing or issued a formal disposition of the September 24, 1999, NOI.

3

On November 12, 1999, King wrote a letter to Warden Berghuis complaining about the treatment of prisoners at Brooks and asking that his concerns be "immediately investigated and corrected, with a written explanation as to why such transpired." He also advised:

> Frankly, I don't like your facility at all. Your staff rival in abusing their authority and feel they don't have to answer to anyone. I've watched them provide situations and retaliate against those who remotely stand up for themselves. It is shocking to me that you allow such conduct, and continue to let such transpire.

(Ex. 12.)

On February 19, 2000, Resident Unit Manager ("RUM") Sharon Wells issued King a ticket for being out of place. King was found not guilty. (Ex. 13.) On March 31, 2000, Corrections Officer Bonnie Lewis issued King a major misconduct for creating a disturbance. (Ex. 14.) King was found not guilty of this charge. (*Id.*) During the investigation on the ticket Lewis advised that King would watch the officer's station, and that he would pretend to be on the telephone just so he could to listen in on what the officers were saying. Lewis felt very uncomfortable when he was around the desk and stated that King "interferes with our authority of running the unit." (Ex. 14.)

On April 20, 2000, RUM Wells wrote a memo to Deputy Warden Shirlee Harry requesting that King be moved from Conklin Unit to one of the other five housing units at Brooks:

> He is becoming increasingly more powerful in the eyes of the prisoners in Conklin Unit. He has made the statement to a unit officer that "these guys in

> the unit will do what ever I ask" "If I wanted to cause a disturbance I could anytime". Prisoners have also approached me on several occasions with different types of request and when refused they will either state that "they will get with someone who will take of it" and when the grievance is written it is more often then not written by prisoner King or they will state that they will make sure "King knows about this" The most recent situation, in where King was found not guilty on a Creating a Disturbance, has boosted King's status in the unit with the prisoners. I believe it should be considered a security risk to the unit officers when prisoner Kings' authority over other prisoners is higher then the officers working in the unit. I have attached other examples of his behavior to this report.

(Ex. 15 (errors in original).)

On April 27, 2000, King wrote a letter to Deputy Warden Harry complaining about staff misconduct in connection with the misconduct ticket written by Officer Lewis. King advised that three employees were guilty of rule infractions and demanded that they be investigated and suspended. (Ex. 16.)

In early May 2000, Deputy Warden Harry requested that King be transferred to another Level II facility. On May 8, 2000, in response to Deputy Warden Harry's request that King be transferred, Curtis Chaffee, the Transfer Coordinator at Brooks, prepared a Security Classification Screen Review for King. The review provided that King's true security level was Level II, that he was "manageable in Level II/Remain Level II," and suggested transfer to Carson Correctional Facility (DRF) ("Carson"), another Level II facility. (Ex. 17.) That same day, Chaffee sent the following email to Chuck Zamiara, a Classification Specialist at the Correctional Facility Administration ("CFA") Central Office:

> Deputy Harry has asked for this prisoner to be transferred to an alternate Level II. We are asking for DRF placement. The reason for request is that he has

5

> been at LRF for 6 months during this time, he has developed a cadre of followers over whom he has substantial influence. It seems that he can instigate them to create problems (grievances, complaints to Warden's Forum, etc.) while he remains uninvolved directly. Currently he is printing out grievances about various issues and having other prisoners sing [sic] them and send them in.
> Deputy Harry has asked for a "break" from prisoner King and would accept him back after a period of time.

(Ex. 19.)

According to Dan Bolden, who was the Deputy Director of the MDOC from 1984 to 2002, Deputy Warden Harry's request for a "break" from King was not an unusual request. "High maintenance" prisoners need to be moved periodically to give staff a rest.

Although prisons may request transfers, the decision to transfer an inmate from one institution to another is made by personnel at MDOC's Central Office, namely, Classification Specialists. As a Classification Specialist, Zamiara processed 30 to 50 transfers a day. He had authority to approve transfer requests unless the prisoner was on the CFA Hold List.

The MDOC houses 50,000 prisoners in 45 institutions. Deputy Director Bolden developed the CFA Hold List as an administrative tool to enable the MDOC's Central Office to monitor between 200 and 300 prisoners who warranted special attention based on three criteria: 1) risk of violence; 2) risk of escape; and 3) perceived to cause problems in prisons. The last category includes prisoners who are transferred frequently because they wear out staff with multiple grievances or lawsuits. Prisoners on the CFA Hold List cannot be transferred without the approval of the Classification Director or the Deputy Director. The CFA Hold list enables the Central Office to consider many factors associated with these individuals that may not be available to the individual prisons.

6

King was placed on the CFA Hold List on August 8, 1990, because of concerns that he had been involved in an escape attempt in March 1989. (Mize Dep. 20; Ludwick Dep. 11-12.) Although King was found not guilty of a major misconduct for the escape attempt, the Central Office continued to keep him on the CFA Hold List.

Because King was on the CFA Hold List, Zamiara had to obtain the approval of Classification Director Ludwick before approving him for a transfer. After Zamiara discussed King's case with Ludwick, the decision was made that he should be transferred to Level III. Within 40 minutes of receiving Chaffee's transfer request, Zamiara responded, "Let's send him to URF as a level III, note in the departure, prisoner is perceived as a disruptive prisoner who is manipulating others to create unrest at LRF [Brooks]." (Ex. 19.) Chaffee altered the already completed Security Classification Screen to reflect that King's true security level and actual placement level was "III" rather than "II", and changed the placement from "DRF" (Carson) to "URF." (Ex. 17.)

On May 12, 2000, Warden Mary Berghuis signed the order transferring King from Brooks to Chippewa Correctional Facility (URF-III) ("Chippewa"). (Ex. 20.) The reason given for the transfer was "SCC [Security Classification Committee] recommendation," and "Prisoner manipulates other prisoners to be disruptive." (*Id.*)

After King's transfer an issue arose over the discrepancy between the May 8, 2000, screen which said that King was "manageable at Level II/Remain at Level II," and the transfer order that said he needed to be transferred to a Level III because he "manipulates

7

other prisoners." (Exs. 23, 26). On June 14, 2000, Defendant Zamiara advised Defendant Warden Berghuis that a new security classification screen review should be prepared. (Ex. 23.) At Defendant Warden Berghuis's direction, Defendant Chaffee prepared a new screen to reflect that King needed a higher level of security because he manipulated other prisoners to be disruptive. Defendant Chaffee back-dated the new screen to May 8, 2000. (Ex. 24.) Defendant Singleton approved the new screen. (*Id.*)

In a letter dated July 26, 2000, Defendant Zamiara responded to King's inquiry regarding his transfer to Level III:

> Please be advised that your true security level was changed to level III, this was done through the "departure" procedure. Staff at three facilities perceived you as a individual who was able to manipulate other prisoners to unrest, which if left unchecked, could create a threat to the good order and security of the facility. The underlying issue seemed to center around the prisoner property policy. The proper method to raise issue with the prisoner property policy is through the prisoner grievance process . . . ."

(Ex. 28.)

On October 23, 2000, Deputy Director Bolden responded to King's inquiries regarding his transfer and advised that because King's past two facilities found that he had been attempting to manipulate or instigate other prisoners, he had been approved for a one level departure to Level III for a "period of adjustment." (Ex. 30.) Bolden declined King's request to remove him from the CFA Hold List. (*Id.*) On November 16, 2000, Defendant Zamiara denied a request to transfer King back to a level II facility. (Ex. 33.) On February 28, 2001, Deputy Director Bolden approved King's transfer to Thumb Correctional Facility (TCF), a Level II facility. (Ex. 35.)

**III.**

The gravamen of King's complaint is that Defendants reclassified him and transferred him to a higher security facility in retaliation for his exercise of his First Amendment rights, specifically, for his participation in *Cain* and his assistance of other prisoners with their grievances.

The elements of a retaliation claim are "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Prior to trial this Court determined that King had satisfied the first two elements of the retaliation analysis: he had engaged in protected conduct and he was subject to an adverse action. (Dkt. No. 153, 04/21/2009 Mem. Op. & Order 14.) Accordingly, the only issue for trial is the third element: whether King's reclassification and transfer to a higher security level prison were motivated at least in part by King's protected conduct. If King establishes this element, the burden then shifts to Defendants to show that they would have taken the same action in the absence of protected activity. *King I*, 150 F. App'x at 491 (citing *Thaddeus-X*, 175 F.3d at 399). Under the causation element of a retaliation case, "the subjective motivation of the decisionmaker is at issue." *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001). The credibility of all parties and witnesses is critical to the determination of the Defendants' subjective motivations.

## IV.

King was the first and primary witness to testify at trial. King is remarkably intelligent and has an encyclopedic memory of the events in his MDOC institutional life since 1983 and the policies of the MDOC. King's testimony was generally credible, but his testimony was colored by his high opinion of himself. King testified that he has resided in twelve MDOC facilities and has quite a grasp of the differences in the facilities, real and perceived. King testified that he has had very few misconducts during his incarceration, and expressed pride in the fact that he had prevailed on several major misconduct tickets throughout his MDOC tenure. (*See, e.g.*, Exs. 13, 14.) He testified that before he arrived at Brooks, he generally got along with staff, and had been commended for saving staff from assaults. At Brooks, however, staff was rude to him from the beginning, accusing him of being a troublemaker. King assumes that they held this opinion because of his involvement in the *Cain* litigation. King related with great satisfaction the role he played as an "active participant" in the *Cain* lawsuit, remaining in "constant contact" with the Prison Legal Services Attorneys who represented the *Cain* plaintiffs. He related that he would receive information from the *Cain* lawsuit and would disseminate it to fellow prisoners. He boasted his popularity with prisoners such that he was elected by other inmates to serve as a representative on the "Warden's Forum." The role of prisoner representatives on the Warden's Forum is "to assist with the identification and resolution of prisoner concerns." (Ex. 1, OP-LRF/MTF-04.01.150.) King testified that he was the chairman of the Warden's

Forum at Brooks in 2000, and that Deputy Warden Harry had commended him for his performance.

King testified that officials at Brooks were not complying with policy directives, and that he was therefore required to assist other prisoners in writing many grievances. Rather than filing grievances himself, King wrote letters directly to the warden and deputy warden demanding that they investigate and suspend their officers for misconduct. (*See*, *e.g.*, Exs. 12, 16.)

Both Level II and Level III are medium security facilities, with substantially the same programming. King testified, however, that as a result of his transfer to Chippewa, he had far less freedom. At Level II prisoners can move freely between programs, the yard, and the day rooms, they can make unlimited telephone calls, and they can choose where to sit at mealtime. At Level III, on the other hand, prisoners' movements are more restricted, and telephone calls are limited. Of particular concern to King was that at mealtime he could not sit wherever he wanted, which greatly affected his ability to obtain affidavits for his work on the *Cain* case.

King was adamant that his transfer was unjustified because he had no misconducts and had done nothing more than help other prisoners with their grievances.

The Court observed Defendant Wells to be a very credible witness. As Resident Unit Manager, Wells had 242 prisoners under her supervision, and she was justifiably concerned about prisoner-created unrest. Wells learned from the corrections officers under her

supervision that King was trying to listen in on their conversations, that he was interfering in discussions between officers and other prisoners, that he was boasting that he could cause a disturbance anytime, and that he was becoming increasingly powerful over the prisoners. Wells believed it should be considered a security risk to the unit officers when King's authority over the other prisoners was higher than the officers working in the unit. Wells thought King was a troublemaker, but there is no evidence that her assessment was based on his protected activities. Her concern was his power over other prisoners. In light of this concern, Wells asked that King be moved to another unit within the Brooks facility. The Court finds that Wells did not ask that King be transferred to a different facility, she did not ask that his security level be increased, and she had no involvement in the decision to increase his security level.

As a transfer coordinator, Defendant Chaffee did not have much personal contact with prisoners. Chaffee did not know King, and he had no knowledge of King's involvement in the *Cain* litigation. Chaffee sent the transfer request to Zamiara at the behest of Deputy Warden Harry, and the reasons given for the transfer came from Deputy Warden Harry. Chaffee changed King's screening level from II to III based on the email from Zamiara. According to Chaffee, the Central Office has the final authority on transfers, and he follows its orders. Chaffee did not challenge Zamiara's decision to change King's security level because he was not in a position to do so and because he assumed that Zamiara had a good reason for doing so. When Chaffee drafted King's new security screen on June 14, 2000, he

12

back-dated it to May 8, 2000, because it was designed to replace the security screen that he had altered on May 8. Notwithstanding King's suspicions, the Court finds that by back-dating the document, Chaffee was not intending to be deceptive or to cover anything up.

Defendant Assistant Deputy Warden Michael Singleton's only involvement in King's transfer was his approval of the back-dated security screen. Singleton probably ran into King in connection with the Warden's Forum, but he did not remember King and he had no participation in the decision to reclassify King to Level III. The decision to reclassify King to Level III was made by the Central Office, and Singleton understood that he was bound by that decision.

Defendant Warden Mary Berghuis testified that because there were 1244 prisoners at Brooks at any given time, it was difficult for one prisoner to stand out. However, King did stand out because he has a "huge ego" and "superimposes his will on the MDOC" through suspicions and questioning of the authority of MDOC officials. She knew him from the Warden's Forum, but she did not harbor any ill will toward him based on his activities there. She approved of King's transfer to another facility, not because of his activities on the Warden's Forum, or because of his filing of grievances, or even his assistance with other prisoners' grievances, but because he manipulated other prisoners. Berghuis did not question Central Office's decision to change King's security level from II to III. As Berghuis explained, the people in Central Office are the experts. They have a different perspective and they have security considerations that are not within the knowledge of the local prisons. In

addition, she thought that changing King to Level III was a good decision because it would enable them to manage him better.

Deputy Warden Harry is not a defendant in this action. However, her testimony corroborated the testimony of the other Defendants who worked at Brooks. Deputy Warden Harry testified that grievances and lawsuits are a daily occurrence, and that they do not provoke punitive action. She testified that King was not transferred because of his filing of grievances, but because her staff needed a break from him. Although King did not have any misconducts, Deputy Warden Harry explained that some prisoners maneuver other prisoners to engage in misconduct while they themselves stand back, and it is difficult to prove the misconduct against the manipulator. A transfer is a tool used by prison officials to disrupt a manipulative prisoner's relationships with other prisoners and to dismantle problems before they occur. Deputy Warden Harry was willing to accept King back at Brooks after a period of adjustment at another institution. She also testified that Levels II and III are not very different and that they generally offer the same programs and schedules.

Defendant Chuck Zamiara has been retired since late 2004. This gentleman impressed the court with his detached demeanor yet detailed knowledge of the system of transfers and security classifications. Zamiara did not know King. He did not know that King was on Warden's Forum, and he testified that he had no interest in King's involvement in the *Cain* litigation. Zamiara did not have an independent recollection of the circumstances of King's transfer because it was not a significant event. However, based upon his review of the file,

14

he testified that his actions relating to King's transfer were based solely upon the email from Chaffee and his review of King's files. The reference in Chaffee's email to grievances was not the basis for the decision to transfer King to Level III. Zamiara would have suggested a transfer to Level III whether or not King had been using the grievance process. As indicated in King's file, King had been transferred from Saginaw to Brooks on the basis of suspicions that he was organizing prisoners to protest. Six months following that last transfer, Zamiara was seeing new allegations that King had a cadre of followers and was instigating problems. Zamiara testified that Chaffee's email caused bells to go off at Central Office. The reason for increasing King's security level was that King was again attempting to control other prisoners. Because King's last transfer to a Level II facility had not worked to curb his attempts to control other prisoners, it was felt that a transfer to a Level III facility would be appropriate. As Zamiara explained to King in a letter dated July 26, 2000, "Staff at three facilities perceived you as a individual who was able to manipulate other prisoners to unrest, which if left unchecked, could create a threat to the good order and security of the facility." (Ex. 28.)

Neither Zamiara nor Ludwick could testify with any certainty which of them first recommended that King be transferred to a Level III facility, but Ludwick had the final authority on the transfer. Ludwick agreed with Zamiara that when an institution says a prisoner instigates others to create unrest, this raises a red flag. Ludwick explained the significance of this phrase as follows:

15

> [M]any of our prisoners throughout the agency have a sophisticated influence on others that can serve to incite, that can serve to have others take part in activities that would otherwise be considered inappropriate by our departmental rules and regulations. So when you use language like instigate and substantial influence, that results in a noticeable concern on behalf of classification specialists responsible for ensuring that we put the right prisoner in the right bed so that his program needs, medical needs and security needs can be addressed.

(Ludwick Dep. 24.) Ludwick testified that the May 2000 email from Chaffee, together with King's history of a suspected attempted escape, gave them "ample rationale " to move him to a higher security level to enable them to better manage or observe him. (Ludwick Dep. 27.) Ludwick approved the increase in King's security level and Zamiara instructed Chaffee to note in the departure, prisoner is perceived as a disruptive prisoner who is manipulating others to create unrest at LRF." (Ex. 19.) Deputy Director Bolden supported the decision to increase King's security level. As he emphasized in his testimony, in the prison setting there is no constitutional right to assemble and encourage open defiance. Because King was a leader, his influence over other prisoners was a legitimate concern for staff.

None of the Defendants who worked at Brooks (Wells, Chaffee, Singleton, Berghuis) were involved in the decision to increase King's security level. They simply prepared the transfer documents in response to the directions they received from Central Office. King contends that their "[r]eliance on a superior's orders does not in itself dissipate all liability." *Thaddeus-X*, 175 F.3d at 393. If a defendant knew or should have known that his conduct violated the plaintiff's rights, he cannot hide behind the cloak of reliance on orders. *Id.* (citing *Forsyth v. Kleindienst*, 599 F.2d 1203, 1216-17 (3d Cir. 1979)). King contends that

because he did not engage in any misconduct warranting an increase in his security level, the Brooks Defendants knew or should have known that his transfer from Level II to Level III violated his rights, and that they accordingly cannot hide behind the defense of reliance on orders.

Contrary to King's assumptions, it is not necessary to have proven misconducts to justify a security classification increase. Prisoners do not have a federally protected right to remain at a particular security level. *Williams v. Wilkinson*, 51 F. App'x 553, 557 (6th Cir. 2002) (citing *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976)). Accordingly, the MDOC can change a prisoner's security level for institutional purposes, even in the absence of misconduct, as long as it is not in retaliation for protected activities. As Rick Smith, Deputy Warden at Brooks in the fall of 1999, explained, "[t]here's a distinction between the evidentiary standards for a finding of guilt in a major misconduct versus the Security Classification Committee's belief about the behavior that a prisoner engages in." (Rick Smith Dep. 14.) In order to prevent problems before they arise, the prison must be able to change to change an inmate's security level based on allegations as opposed to proven charges.

None of the Defendants showed any particular animus toward King, nor did they exhibit any lack of respect for his right to file grievances, to bring issues to the Warden's Forum, or to participate in the *Cain* litigation. Defendants unanimously testified that they wanted King transferred not because he engaged in protected activities, but because he was

17

using his influence over other prisoners to create problems and was undermining the authority of prison officials. The Court finds Defendants' testimony regarding their motivation to be credible.

Deputy Warden Harry requested that King be transferred in part because it appeared that he was able to instigate other prisoners "to create problems (grievances, complaints to Warden's Forum, etc.) while he remains uninvolved directly." (Ex. 19.) She also noted that he was printing out grievances and having other prisoners sign them. *Id.* Contrary to King's assertions, this was not retaliation on the basis of protected behavior. As noted in *King II*, although prisoners are entitled to receive assistance from jailhouse lawyers where necessary to ensure their right of access to the courts, a prisoner has no constitutional right to function as a jailhouse lawyer or to assist other prisoners with legal matters. *King II*, slip op. at *3 (citing *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993)); *see also King I*, 150 F. App'x at 492 ("[A]n inmate does not have an independent right to help other prisoners with their legal claims."). To the extent that Defendants were motivated in transferring King based upon his manipulation of other prisoners to file grievances to achieve King's own goals, they did not retaliate against him on the basis of any protected conduct.

Accordingly, this Court concludes that while King's reclassification from Level II to a Level III was more restrictive and seemingly adverse to King, the preponderance of evidence does not support a retaliatory motive on the part of these Defendants. King's demeanor in court was consistent with the MDOC employee witnesses' description of his

personality and power. While King's participation in *Cain* and communication with fellow prisoners concerning *Cain* issues were protected, the preponderance of the evidence demonstrates that King's behavior did not stop there, but also involved agitating other prisoners and attempting to disrupt the delicate balance of authority the MDOC must retain over prisoners in its charge. Defendants' decision to transfer King and to increase his security level was based on this behavior, not on his protected conduct. King's reclassification and transfer to a higher security level prison were not motivated by King's protected conduct. Moreover, even if they were motivated in part by any protected conduct, the Court finds that Defendants would have taken the same action in the absence of King's protected activity.

V.

It is the finding of this Court that Plaintiff has failed to preponderate on his claim of retaliation giving rise to institutional transfer and temporary increased security level. Accordingly, Defendants are entitled to a judgment of no cause of action.

An order and judgment consistent with this opinion shall be entered.


Dated: October 20, 2009 /s/ Robert Holmes Bell
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE